UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff(s),          CASE NUMBER: 09-20223
                                          HONORABLE VICTORIA A. ROBERTS
v.

ALAN SILBER,

                Defendant.

_____/

## ORDER CONCERNING OBJECTIONS TO
## PRESENTENCE INVESTIGATION REPORT

**I.**     **INTRODUCTION**

        Alan Silber is before the Court to be sentenced. Probation filed a Presentence

Investigation Report ("PSIR") which calculates Silber's Sentencing Guidelines range to

be 51 to 63 months. The Government agrees with this calculation. Silber objects. He

contends that the appropriate range is 6 to 12 months, based on an offense level of 10

and a Criminal History Category of I. However, he also states, "[i]f, in the end, the Court

accepts defendant's Guidelines computations, a probationary sentence, with, perhaps,

a requirement that he participate in a program of community service" would be an

appropriate sentence. (Doc. #185)

        The Court held an Evidentiary Hearing on November 2, 2010 on the objections to

the PSIR. The Court finds that Probation's calculations are correct and that Silber's

Guidelines range is 51 to 63 months, based on an offense level of 24 and a Criminal

History Category of I.

## II.    BACKGROUND

From around December 2006 to around March 2007, Alan Silber worked as a doctor at RDM Center ("RDM"), a medical clinic purporting to specialize in treating patients with asthma and arthritis by providing injection and infusion therapy. (First Superseding Indictment, Doc. # 92) The true purpose of the clinic, however, was to defraud Medicare. (3/30/10 Tr. 77)[1] Owner and operator, Jose Rafael Martinez, along with operator, Denisse Martinez, hired Silber to work as the clinic's sole physician. (*Id.* at 79) RDM paid kickbacks and bribes to medicare beneficiaries who allowed the clinic to use their beneficiary numbers to file claims for unnecessary medications. (*Id.* at 79-80) Denisse Martinez instructed Silber to order tests, make entries in medical records, and authorize treatments for the clinic's patients that were medically unnecessary. (*Id.* at 82) She testified that the clinic had ten regular patients as well as some patients that came for an initial evaluation but never returned to the clinic. (*Id.* at 79) The majority of these patients were elderly, impoverished and in poor health. Some of the patients had pre-existing medical conditions, such as Diabetes and Hepatitis C, that made them particularly vulnerable to the negative side effects of the medications administered at the clinic. (*Id.* at 217, 251-60) Moreover, some of them were addicted to illegal narcotics. (*Id.* at 81)

In order to be reimbursed for services provided to Medicare beneficiaries, health care providers are required to obtain a "provider number." (*Id.* at 94, 195) Silber completed a reassignment of benefits form, allowing the clinic to use Silber's provider number to submit false and fraudulent claims to Medicare in order to receive payment.

---

[1]"Tr" are references to the Trial Transcript.  Trial was conducted March 25, 2010 through April 2, 2010.

(*Id.* at 93-95) A medical biller was hired to make it appear that the clinic was providing legitimate medical services. The clinic submitted approximately $970,316 worth of false and fraudulent claims to Medicare under Silber's provider number and received $649,000.17 from Medicare. The funds received were deposited in RDM's bank account and Silber was paid approximately $1,000 per week for his role in the scheme.

While working at RDM, Silber ordered and prescribed two rare drugs, Acthar and Cosyntropin, at the request of Denisse Martinez. (*Id.* at 83-84) Silber had no previous experience with these drugs and knew that Martinez had no medical training, but agreed to prescribe the drugs to every patient who came to RDM more than once. Martinez conducted the initial evaluation of the patients, writing down the diagnosis and treatment plan. Silber followed this plan, stating at trial that he agreed with Martinez's decisions. Martinez testified that these decisions were based on her desire to receive the highest payments possible from Medicare. She testified that RDM did not purchase the total amount of Acthar and Cosyntropin that it billed Medicare for, and that patients were administered a diluted dose of what was purchased. (*Id.* at 89-90) Each of the clinic's ten regular patients received one of the two drugs. (*Id.* at 88) The patients also received intravenous infusions of vitamins, another expense covered by Medicare. (Id. at 89)  The Government's expert witness, Dr. Raymond Yung, testified that Silber's treatment plans were not proper from a medical perspective. (*Id.* at 210-62)

Silber was indicted on one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349, and six substantive counts of health care fraud in violation of 18 U.S.C. § 1347 and 2. Silber was found guilty of the six substantive charges, Counts two through seven. He was acquitted of the conspiracy charge. The statutory maximum penalty under § 1347 is ten years' imprisonment and a $250,000 fine. The

Probation Department's PSIR calculates the applicable Guidelines range to be 51 to 63 months. Silber submits eleven objections to the Report as written. Probation amended the Report in response to some of the objections. The three primary objections (Objections 1, 2, and 3), which relate to the computation of the sentencing range, are addressed below.

## III.    ANALYSIS

When sentencing a defendant, the Court begins by correctly calculating the applicable United States Sentencing Commission Guidelines ("the Guidelines") range. *See Gall v. United States*, 522 U.S. 38, 49 (2007) (citing *Rita v. United States*, 551 U.S. 338 (2007)). In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that sentencing judges are not required to follow the Guidelines; however, the Guidelines are advisory. 543 U.S. 220, 245-46 (2005). The Court, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264; *see also Gall*, 552 U.S. at 50 n. 6 ("The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.").  Further, "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). In the Sixth Circuit, sentences within the applicable Guidelines range are presumptively reasonable on appellate review. *United States v. Richardson*, 437 F.3d 550, 553 (6th Cir. 2006). If the sentence is outside of the Guidelines range, however, the appellate court may not apply a presumption of unreasonableness. *Gall*, 552 U.S. at 51.

After calculating the applicable Guidelines range, the Court gives the parties an opportunity to argue for whatever sentence they deem appropriate. *See Gall*, 522 U.S. at 49. The Government bears the burden to show, by a preponderance of the evidence, that a particular sentencing enhancement applies. *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003). Finally, the Court must consider "all of the relevant [18 U.S.C. § 3553(a)] factors and impose a sentence that is sufficient but not greater than necessary to comply with the purposes of § 3553(a)(2)." *United States v. Webb*, 616 F.3d 605, 610 (6th cir. 2010) (citation and internal quotation marks omitted). The relevant statutory factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed–
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established [by the Guidelines]...
> (5) any pertinent policy statement [issued by the Sentencing Commission]...
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (2010).

When considering the statutory factors, the Court does not presume that the Guidelines range is reasonable. *See Gall*, 522 U.S. at 50. Instead, the Court "must make an individualized assessment based on the facts presented." *Id.* If the Court "decides that an outside-Guidelines sentence is warranted, [it] must consider the extent

of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* The Court is obligated to explain its reasons for imposing a particular sentence. *Richardson*, 437 F.3d at 554. "Where a defendant raises a particular argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." *Id.*

The courts of appeals review sentences for an abuse of discretion. *Gall*, 522 U.S. at 46. The role of the appellate court is to ensure that the district court did not make any significant procedural errors and to ensure that the sentence imposed is substantively reasonable. *Id.* at 51. The types of procedural errors the appellate court looks for are: failing to calculate, or improperly calculating, the Guidelines range; treating the Guidelines as mandatory; failing to consider the § 3553(a) factors; selecting a sentence based on clearly erroneous facts; or failing to adequately explain the chosen sentence. *Id.* When reviewing the substantive reasonableness of the sentence the court takes into consideration the totality of the circumstances, "including the extent of any variance from the Guidelines range." *Id.*

### A.    Guidelines Sentencing Range

Applying the 2009 edition of the Guidelines Manual, the PSIR calculates Silber's total offense level to be 24 and places him in Criminal History Category I. (PSIR,  p. 13) According to the PSIR, the applicable Guideline range is 51 to 63 months. (*Id.* at 19) The Government concurs, requesting that the Court impose a sentence within the Guideline range of 51 to 63 months. (Doc. # 186, p. 1) Silber objects. He argues that the applicable range is much lower, at 6 to 12 months, based on a total offense level of 10. (Doc. # 185, p. 14).

6

The Court must resolve disputes that pertain to calculations pursuant to the Sentencing Guidelines. *See Gall*, 552 U.S. at 49-51 (discussing factors district courts must take into consideration when imposing a sentence). Accordingly, the Court considered the parties' arguments, including Silber's objections, as discussed below.

### 1.    Calculation of Defendant's Base Offense Level

Silber was convicted of six counts of health care fraud. Under U.S.S.G. § 3D1.2(d), these counts are grouped together, as the offense level is determined largely by the amount of harm or loss to the victim. The offense level applicable to the group is "the highest offense level of the counts in the Group." *Id.* § 3D1.3(a). Here, the six counts are the same and, thus, have identical offense levels.

As correctly noted in the PSIR, the guideline for Silber's offense, fraud, an economic offense, is located at § 2B1.1(a)(2). A violation of 18 U.S.C. § 1347 carries a statutory maximum penalty of ten years' imprisonment. Thus, under § 2B1.1(a)(2), the base offense level is 6. Silber does not dispute the base offense level.

### 2.    Specific Offense Characteristics Adjustments

The Probation Department arrives at a total offense level of 24 after applying three enhancements to Silber's base offense level. First, Probation adds fourteen levels pursuant to U.S.S.G. § 2B1.1(b)(1)(H) for loss amount. Next, Probation adds two levels pursuant to U.S.S.G. § 2B1.1(b)(13), stating that the offense involved the conscious or reckless risk of death or serious bodily injury. Lastly, Probation adds two levels pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust or use of a special skill. Silber objects to all three enhancements.

### i.    Loss Amount

Because the total loss involved an amount exceeding $5,000, U.S.S.G. §

2B1.1(b) applies. Pursuant to this provision, a fourteen-level sentencing enhancement is

appropriate if the loss amount is between $400,000 and $1,000,000. However, if the

loss amount is between $10,000 and $30,000, as Silber suggests, a four-level

enhancement is appropriate. The Probation Department applies the fourteen-level

enhancement (PSIR, p. 13)   The Government concurs. (Doc. #186, p. 15) Probation

and the Government rely on the fact that Medicare was billed $970,316 throughout the

course of the scheme, making that figure the total attempted loss. (PSIR, p. 11, Doc. #

186, p. 15)

Silber objects to this enhancement. (Addendum to the PSIR, pp. A-1-A-3) Silber

contends that because he was acquitted of Count One of the indictment, charging

conspiracy to commit health care fraud, he cannot be held liable for the totality of the

billings submitted by RDM to Medicare. (*Id.* at A-1) He contends that the loss amount

attributable to him is limited by the claim amounts listed in the indictment as Counts two

through seven, totaling $20,874. (*Id.*) Therefore, only four levels should be added,

pursuant to § 2B1.1(b)(1)(4), for a loss between $10,000 and $30,000. Citing *United

States v. White*, 551 F.3d 381, 386 (6th Cir. 2008), Silber emphasizes that the law does

not require courts to rely on acquitted conduct when sentencing defendants. (*Id.*) He

further states that the evidence at trial prevents this Court from attributing all of the bills

submitted by RDM to Medicare to him because he was not a part of the processing of

claims, the Martinezes kept the amount of the bills a secret from him, and this amount

was not "reasonably foreseeable" to him under § 1B1.3(a)(1)(B). (*Id.*)

Probation responds that under § 1B1.3(a)(1)(B), "a defendant may be held

accountable for reasonably foreseeable conduct 'undertaken by the defendant in concert with others, whether or not charged as a conspiracy.'" (*Id.* at A-3 (citing U.S.S.G § 1B1.3(a)(1)(B)). In addition, the defendant need not have known of the conduct of a co-defendant to be held accountable for that conduct; foreseeability does not equate to knowledge. (*Id.* (citing ROGER W. HAINES, JR. ET AL., FEDERAL SENTENCING GUIDELINES HANDBOOK 379-80 (2009-2010 ed.)). Probation contends that as the only doctor employed by the clinic, and by allowing the Martinezes to utilize his Medicare provider number, Silber was indispensable to the scheme, facilitated all of the fraudulent billing activity, and should be held accountable for the total attempted loss. (*Id.*) Indeed, at trial Ms. Martinez testified that if Silber did not approve of the clinic billing Medicare for the medications utilized at the clinic, she would have needed to find a different physician. (3/30/10 Tr. 85)

The Government agrees with Probation that Silber should be held accountable for the total intended loss amount, for the reasons stated in the PSIR and for other reasons. The Government argues that the error in Silber's approach "is that there is nothing that distinguishes Defendant's conduct with respect to the specific claims charged in the six substantive counts from every other claim submitted to Medicare by RDM." (Doc. # 186, p. 16) Rather than including within the substantive counts, the total sum of the claims submitted in which Silber played a role, the Government chose a random, representative sample from the hundreds of claims submitted by RDM. (*Id.*) Thus, pursuant to U.S.S.G. § 1B1.3(a)(2), the Government states, the Court should determine specific offense characteristics based on "all acts and omissions...that were part of the same course of conduct or common scheme or plan as the offense of conviction." (*Id.*) The Government also argues that Silber's contention that the Court

would be sentencing him on the basis of conduct for which he was acquitted is erroneous because, although he was acquitted of conspiracy, he was not acquitted of defrauding Medicare. (*Id.* at 17) Thus, "[t]he jury correctly recognized that each claim submitted by Defendant (and therefore each claim submitted by RDM) was the product of fraud, and the Defendant knew it." (*Id.*)

The Court finds that the Probation Department and the Government correctly calculate the loss amount to be between $400,000 and $1,000,000, making the fourteen-level enhancement appropriate. The fact that Silber was acquitted of the conspiracy charge does not mean that the jury found that he was not culpable for the overall conduct of the clinic, as his objection asserts. "The essence of a conspiracy is the agreement to commit the offense and not the commission of the substantive offense." *United States v. Hughes*, 505 F.3d 578, 588 (6th Cir. 2007). Silber was acquitted of the "agreement," but not the conduct underlying the agreement.

Silber relies on the specific medicare claim amounts alleged in Counts two through seven, however, ¶ 29 of the indictment incorporates by reference ¶ 24 as a description of the scheme and artifice of the conduct which the jury found that Silber engaged in. Paragraph 24 states:

> The owners and operators of RDM, along with ALAN SILBER and their co-conspirators, cause the submission of approximately $970,316 false and fraudulent claims to Medicare under the provider number of ALAN SILBER, seeking reimbursement for the costs of infusion and injection therapy and other services that were not medically necessary and were not provided.

Silber does not dispute the Government's contention that the use of his provider number was indispensable to the execution of the fraud, nor does he dispute that the clinic submitted $970,316 worth of claims to Medicare. The Commentary to U.S.S.G. §

2B1.1(b)(1) defines loss as "the greater of actual loss or intended loss." § 2B1.1, comment (n.3). Because $970,316 was the "pecuniary harm that was intended to result from the offense," it represents the loss amount under that provision. *Id.*

U.S.S.G. §1B1.3 supports this conclusion. That provision lists factors that determine the Guideline range. Specific offense characteristics are determined by: (1) acts aided or abetted by the defendant; and (2) in the case of jointly undertaken criminal activity, whether or not a conspiracy is charged, acts in furtherance of the joint criminal conduct that are reasonably foreseeable. *Id.* § 1B1.3(a)(1). By completing a reassignment of benefits form to reassign to RDM payments for services billed to Medicare under Silber's provider number, Silber aided and abetted the clinic's act of submitting all of the fraudulent Medicare claims.

Moreover, § 1B1.3(a)(2) directs the sentencing court to base the loss amount, with respect to offenses grouped together under § 3D1.2(d), on acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." Thus, claims not included in the representative sample contained in the indictment can still form the basis of the loss amount for sentencing purposes because they were part of the same course of conduct as the claims constituting the formal charges that Silber was convicted of. The Guidelines Handbook indicates:

> In accordance with both § 1B1.3 and §2B1.1, a defendant is responsible for all loss that "resulted from" his fraud scheme. This includes other frauds and crimes that are part of the same course of conduct or common scheme or plan. It is not limited to the loss incurred as a result of the offense of conviction, but may include uncharged but relevant transactions or offenses, and conduct charged in dismissed or acquitted counts.

HAINES ET AL., *supra*, at 377; s*ee also United States v. Burridge*, 191 F.3d 1297, 1304 (10th Cir. 1999) (sentencing calculations under Sentencing Guidelines can include as

relevant conduct actions that do not lead to separate charges and convictions).

Silber claims that he was not privy to the billing process, and offers the testimony of the Martinezes that they actively attempted to conceal from him the amount of money they earned through the scheme. This is not determinative. Probation and the Government make strong arguments that the total loss was nonetheless reasonably foreseeable to Silber under § 1B1.3(a)(1)(B). Even if not reasonably foreseeable, under subsection (a)(1)(A), Silber is accountable for that loss because, like the getaway driver in the bank robbery scheme described in the commentary, he facilitated the commission of the offense. *See* § 1B1.3, comment (n. 2(b)(1)) ("Defendant C is the getaway driver in an armed bank robbery in which $15,000 is taken and a teller is assaulted and injured. Defendant C is accountable for the money taken under subsection (a)(1)(A) because he aided and abetted the act of taking the money (the taking of money was the specific objective of the offense he joined).").

Probation notes that by permitting the Martinezes to use his Medicare provider number, he facilitated the fraudulent billing activities of the Martinezes. In addition, the Government observes that Silber was the clinic's only physician, thus he was the only person who could order the medications that formed the basis for the fraudulent submissions to Medicare. His name and identification number were on each of the claims submitted to Medicare. (Doc. # 92, p.2) Ms. Martinez testified that Silber signed all of the files that contained orders for the two primary medications used at the clinic. (3/30/10 Tr. 4) She testified that the clinic needed a doctor to check patients, sign forms and to bill Medicare and that Silber never hesitated to approve the use of Acthar or Cosyntropin. (*Id.* at 90, 92)

Application Note 2 to § 1B1.3 makes clear that a party who aids the commission

of an offense is accountable for loss amount "regardless of his knowledge or lack of knowledge of the actual...amount" involved. For example, a defendant who transports a suitcase knowing that it contains a controlled substance is accountable for the quantity and type of controlled substance whether or not he was aware of the type or quantity. *Id.* Similarly, as noted above, the getaway driver in an armed bank robbery in which $15,000 is taken is responsible for that amount "because he aided and abetted the act of taking the money." *Id.* Thus, the fourteen-level enhancement for loss amount applies.

### ii. Conscious or Reckless Risk of Death or Serious Bodily Injury

Pursuant to U.S.S.G. § 2B1.1(b)(13)(A), a two-level sentencing enhancement may be applied "if the offense involved [ ] the conscious or reckless risk of death or serious bodily injury." The Probation Department states that this enhancement is appropriate. (PSIR, p. 13) The Government concurs in this enhancement. (Doc. # 186, p. 20) Silber objects. (Add. To PSIR, p. A-4)

Silber argues that the trial evidence does not support a finding that RDM's patients were placed at risk of harm, nor is there evidence that he acted "consciously" or "knowingly." (*Id.*) Virtually every medication, Silber contends, including medications sold over the counter, warn of side effects similar to those included on the package inserts for the drugs Silber prescribed while at RDM. Silber notes that there was no evidence that any of the patients suffered any harm from the medications prescribed and that Dr. Yung's testimony was theoretical in nature. (*Id.*) Lastly, Silber argues that in order for the enhancement to apply, the Court should find that the Guidelines require a showing that he was aware of the alleged risk. (I*d.*) He says that there was no evidence that he was aware of the risk and thus, the enhancement does not apply. (*Id.*)

13

The Probation Department responds that some of RDM's patients had pre-existing medical conditions that could have been exacerbated by the medications prescribed. (*Id.* at A-5) The Government adds that it need only prove that Silber's conduct created a risk of death or serious injury, not that such death or injury occurred and that "[c]ourts have held that the prescription of medications with potential side effects without medical necessity creates such an unjustifiable risk." (Doc. # 186, p. 20) the Government relies on what it calls "two salient factors": that the patients at RDM were particularly vulnerable and that Silber routinely prescribed medically unnecessary drugs to this vulnerable population. The Government explains, "[a] large portion of the patients at RDM suffered from serious infectious diseases, including HIV and Hepatitus C, and/or mental illnesses. Many of them were drug addicts, and admitted as much to the RDM staff." (*Id.* at 21)

The Government emphasizes that one of the drugs prescribed to RDM patients, Cosyntropin, is for diagnostic, not therapeutic, use. (*Id.*) The product insert for another, Acthar, warns that psychic symptoms may result, pre-existing symptoms may worsen and chronic administration of more than 40 units per day may lead to "uncontrollable adverse effects." *(Id.)* In addition, Government expert witness, Dr. Yung, testified that some of the potential risks associated with prescribing these drugs to the vulnerable RDM patients included loss of consciousness, high blood pressure, illness and exacerbated pre-existing illness, and liver failure. (*Id.* at 21-22) Silber did not administer the medications, nor did he monitor the patients' condition after prescribing the medication. (*Id.*)

The two-level enhancement for an offense involving the reckless risk of serious bodily injury or death is appropriate. In *United States v. Awad*, the Ninth Circuit

observed that "[t]he sentencing enhancement for creating a risk of serious bodily injury or death may not be proper in every prosecution for health care fraud, which is designed to punish financial fraud, rather than to enforce standards of medical care." 551 F.3d 930, 941 (9th cir. 2009). However, the court upheld the district court's application of the enhancement where the defendant facilitated administration of medically unnecessary respiratory therapy, often without being present to supervise the treatments. *Id.* The court noted that "[a]t trial, a therapist who worked with Defendant testified that she believed Defendant should have been present at all the treatments because of the risks of adverse side effects." *Id.*

Similarly, Dr. Yung, who testified at Silber's trial, opined that the medically unnecessary treatments provided to RDM's patients, often when Silber was not present at the clinic or in the room in which the medications were administered, could have had adverse effects on those patients. For instance, Dr. Yung stated that the medications given to RDM's patients with diabetes could harm them by increasing their blood sugar levels. (3/30/10 Tr. 250) He described the adverse consequences of increased sugar levels as loss of consciousness and increased blood pressure and stated that their electrolytes could become imbalanced and that they could "get really sick." (*Id.* at 257) Dr. Yung testified further that the medications administered at RDM decreased the functioning of the immune system, inhibiting the ability of patients to fight off infection, a concern for the patients with illnesses such as hepatitis c. (*Id.* at 251) He said that over time the hepatitis could get worse and the patient could experience liver failure. (*Id.* at 257) Dr. Yung "would not have treated [the individual with hepatitis] without involvement of a...liver specialist." (*Id.*) Dr. Yung indicated that there was nothing in the RDM patient files that he reviewed that would suggest a condition in which Achtar or Cosyntropin

were appropriate treatments. (*Id.* at 259-61)

In the Government's Notice of Supplemental Authority (Doc. # 187), the Government attaches a case that is factually, strikingly similar to this case. In *United States v. Mateos*, No. 08-17178, 2010 WL 4068876 (11th Cir. Oct. 19, 2010), Dr. Alvarez and Nurse Mateos were convicted of charges relating to the fraudulent activities of St. Jude Rehabilitation Center, a clinic purporting to treat HIV-positive patients, but in reality operating to defraud Medicare. *Id.* at *1. "The fraud involved falsely diagnosing patients with a condition that would justify treatments of WinRho, an expensive drug reimbursable by Medicare at a rate of $4,900 per treatment to St. Jude." *Id.*

On appeal Mateos argued that the district court erred in applying the § 2B1.1(a)(13)(A) enhancement to her sentence. *Id.* at *18. She stated that there was no evidence showing that she knew or recklessly disregarded the risks associated with giving HIV-positive patients the unnecessary WinRho treatments, the same arguments Silber now makes. *Id.* The Eleventh Circuit rejected this argument. *Id.* It held that,

> The district court did not clearly err in finding that a trained nurse, such as Mateos (who also received training as a doctor in Cuba), would be well aware that any injection always carries some risk of infection or other complications, and that the risk is high when the patients have HIV and weakened immune systems.

*Id.* (citing *United States v. Snyder*, 291 F.3d 1291, 1294-95 (11th Cir. 2002)). The court noted that application of the enhancement was not dependent on whether any patient was actually harmed by the treatments "because the Guidelines provision focuses on the defendant's disregard of risk rather than on the result." *Id.*

Similarly, Dr. Yung testified that the patient files he reviewed indicated that many of the RDM patients had pre-existing conditions, making them particularly vulnerable, and that the medications administered impacted the immune system of these patients,

making them even more vulnerable to infection and illness. Ms. Martinez testified that Silber reviewed all of the patient files periodically. (3/30/10 Tr. 96)  More likely than not, Silber, as a trained doctor, was aware or the serious risks, including weakening of the immune system, loss of consciousness and liver damage, associated with the use of Acthar and Cosyntropin on RDM's vulnerable patient population and was " aware that any injection always carries some risk of infection or other complications." *Id.* Thus, the Government has shown by a preponderance of the evidence, that Silber consciously or recklessly disregarded that risk. *See United States v. Achille*, No. 07-11884, 2008 WL 2003182, *2 (11th Cir. 2008 May 12, 2008) (per curiam) (enhancement for risk of death or serious bodily injury properly applied when Government's expert witness, a doctor, testified that the drugs administered at the fraudulent medical clinic carried the risk of serious side effects); *United States v. Castro-Ramirez*, No. 09-20215, 2010 WL 3259819, * 5 (E.D. Mich. Aug. 18, 2010) (relying on *United States v. Achille* for the proposition that the dispensing of medically unnecessary prescription drugs to third parties creates a risk of serious bodily harm).

Dr. Yung provided other testimony that supports application of the enhancement. He testified that in a 2007 survey of fifty hospitals around the country, a total of only ten doses of Acthar were administered in a one year period. (3/30/10 Tr. 223) However, at RDM, as many as three doses per week of Acthar were administered over the course of several months. (*Id.*) He stated that in over twenty years he only used Acthar two or three times, and those were rare situations where the patient could not receive medication orally. (*Id.* at 228-30) Further, Dr. Yung testified that the prescription inserts for Acthar and Cosyntropin indicated that they were approved by the Food and Drug Administration for diagnostic testing only, and had very limited therapeutic value. (*Id.* at

17

223-26) These warnings, along with testimony that the product inserts described "uncontrollable adverse effects" associated with the chronic therapeutic use of some of the medications, (3/29/10 Tr. 14) reveals that, more likely than not, RDM's patients were exposed to risk of death or serious harm.

Silber filed a Supplement to Defendant's Sentencing Memorandum. (Doc. # 188) He stated that he recently had RDM's patient charts reviewed by Dr. Edward F. Domino, who runs a pharmacology and toxicology laboratory. (*Id.*) Attached to the supplement is Dr. Domino's affidavit, indicating that, in his opinion, "the treatment schedules of each medication in this case more likely than not did not create a risk of death or serious bodily injury to the patients so treated." (*Id.*) The Court subsequently held an evidentiary hearing and received testimony from Drs. Domino and Yung. After considering the testimony of both doctors, along with counsels' arguments, the Court is  persuaded that the two-level enhancement for reckless risk of serious bodily injury should apply.

### iii.     Abuse of a Position of Trust

U.S.S.G. § 3B1.3 states, "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by **2** levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." Probation applies this enhancement and the Government concurs. (PSIR, p. 13; Doc. # 186, pp. 18-19) Silber objects. (Add. to PSIR, p. A-6)

Silber argues that the Court should not apply this enhancement because the relationship between insurers and health care providers does not resemble the kind of fiduciary relationship this provision of the Guidelines is meant to address. (*Id.* at A-7) He

says that the "rigorous system of controls, checks, audits, and reviews of the providers' submissions - backed up by vigorous investigative efforts" resembles the "kind of arm's-length business relationship which is outside the reach of the 'abuse of trust' enhancement." (*Id.*) Silber also contends that the enhancement is not applicable because "abuse of trust" is already included in the base offense level for fraud. (*Id.*)

Silber also argues that he did not use a specific skill to facilitate the offense. (*Id.*) He claims, instead, that "any fraud perpetrated at the RDM clinic depended on the billing skills of the Martinezes, and not the medical skills of Dr. Silber for its success." (*Id.* at A-8) The Probation Department cites the Guidelines Handbook for the proposition that "'doctors and health care providers occupy a position of trust with respect to insurance companies and Medicare', as they 'usually rely on the integrity and honesty of health care providers in their medical findings, diagnoses, and representations that the treatments for which the companies are billed were in fact performed.'" (PSIR, p. A-9 (citing ROGER W. HAINES, JR. ET AL., FEDERAL SENTENCING GUIDELINES HANDBOOK 1149 (2009-2010 ed.)). Silber received a provider number from Medicare, permitting RDM to receive payment for medications provided to patients. Thus, Medicare trusted Silber to provide and bill for medically necessary services. Probation argues that Silber violated this trust. (*Id.* at A-9)

The Government argues that the reasoning of *United States v. Hodge*, 259 F.3d 549 (6th Cir. 2001) and *United States v. Kaminski*, 501 F.3 655 (6th Cir. 2008) applies. t (Doc. # 186, p. 19) According to these cases, the Government argues, Silber betrayed both his patients' trust and the trust of the Medicare system. (*Id.*) "Indeed, Defendant submitted forms to Medicare in which he certified that he would 'not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will

19

not submit claims with deliberate ignorance or reckless disregard for their truth or falsity.'" (*Id.*)

A person abuses a position of trust, pursuant to § 3B1.3, if the position is characterized by professional or managerial discretion, subjecting that person to limited supervision, and if this position "contributed in some significant way to facilitating the commission or concealment of the offense." § 3B1.3, comment (n. 1). In *Hodge*, the Sixth Circuit stated,

> We hold today, in accord with our sister circuits, that certain health care providers, or persons who hold themselves out as providers of care, occupy a position of trust with respect to both public and private insurance companies if they exercise professional or managerial discretion in treating patients and in billing for those treatment, which discretion is given deference by the insurers and helps facilitate the crime.

259 F.3d at 556.

As already noted, Silber, as RDM's only doctor, had substantial discretion to review patient files, examine patients, and to order and administer medications. At trial, a Medicare claims processor testified that claims are processed electronically "on the good faith [basis] that the physicians have billed in accordance with the regulations, and reimbursement is issued to those physicians or practitioners who have billed." (Doc. # 167, p. 196) Although the Martinezes owned the clinic and submitted the bills to Medicare, the scheme would not have been possible without Silber's involvement. Silber still claims that he was tricked by the Martinezes, however, the jury found otherwise and convicted him of intentionally defrauding Medicare. The cases mentioned in *Hodge* hold that physicians and other medical professionals exercise enormous discretion and that the government, as insurer, relies on their honesty and professional discretion. *See id.* at 555-56.

Finally, *Hodge* contradicts Silber's suggestion that abuse of trust is already included in the base offense level for fraud, notwithstanding that "there is a component of misplaced trust inherent in the concept of fraud." (Add. To PSIR, A-6) In *United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995), relied on by Silber, the Second Circuit observed that "[t]he conduct that is the basis of the conviction must be independently criminal...and not itself the abuse of trust" for the enhancement to apply. Here, Silber abused the trust of not only Medicare, but of his patients, by ordering and prescribing unnecessary medications that could have had an adverse impact on their health. The abuse of his patients' trust, however, was not the basis of conviction. The conviction was based on the submission of false and fraudulent claims to Medicare in order to receive payment for these medications. *See*, *e.g.*, *United States v. Kaminski*, 501 F.3d 655, 667 ("In this case, Coleman assumed the mantle of trust accorded to a medical doctor-and there is no question that she did so deliberately-by affirmatively misrepresenting her professional credentials....This behavior was not substantially less egregious than that contemplated by the enhancement provision."). Silber's professional discretion as RDM's sole physician, helped to facilitate the crime and the enhancement is warranted.

### 3. Total Offense Level

After considering the case law, trial testimony, PSIR, the Addendum to the PSIR, the parties' briefings, and the evidentiary hearing testimony, the Court finds the following enhancements apply: (1) fourteen-level enhancement for loss amount between $400,000 and $1,000,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(H); (2) two-level enhancement for conscious or reckless risk of death or serious bodily injury pursuant to § 2B1.1(b)(13)(A); and (3) two-level enhancement for abuse of position of trust pursuant

21

to § 3B1.3. These enhancements, when added to Silber's base offense level of 6, indicate a total offense level of 24.

### 4. Silber's Criminal History Category

According to the PSIR, Silber's criminal history places him in Category I. Neither party disputes this calculation.

## IV. CONCLUSION

Mr. Silber's guideline range, with an offense level of 24 and a Criminal History Category of I, is 51-63 months.

**IT IS ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: December 15, 2010

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on December 15, 2010.

s/Linda Vertriest
Deputy Clerk